## AUBREY HALL v. THE STATE.

No. 15202.   Delivered June 15, 1932.
Reported in 51 S. W. (2d) 585.

The opinion states the case.

*H. R. Bishop* and *Howard Mays,* both of Fort Worth, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; penalty assessed at confinement in the penitentiary for five years.

From the state's evidence the following appears: The deceased went to the home of one Robertson. A few minutes later the appellant arrived and hollered to the deceased that he wanted to talk to him. Deceased went to the appellant's car. Robertson heard some noise indicating that there was a fight but he could not say what was going on as it was dark. Therefore he could relate nothing of consequence. Robertson went to where he heard the noise. The appellant was in his car. Deceased asked Robertson to call a doctor and said: "They had cut him," or "You have cut me." He was speaking to Hall, who was in the car, but called no names. The deceased died three days later.

It was shown that on the day after the difficulty the witness Higgins was told by the appellant that he had a fight with the deceased, and that in the fight he stabbed the deceased.

Witness Noah testified for the state and said that several days before the fight the appellant was searching for missing turkeys, and said: "I will go to Cam Holder's, and if I find my turkeys there, I will kill Cam Holder."

From the witness Parkis it appeared that on the night of the fatal difficulty, the deceased came to the home of the appellant and asked if

there were any turkeys there; that he was told there were none, though, according to the witness, there were in fact some turkeys in the barn as claimed by the appellant. Deceased then left, stating that he wanted to see the appellant, naming him.

The father and brother of the appellant and Parkis then went, at the suggestion of the father, to the appellant's house, where the appellant was told by them that the deceased had been looking for his turkeys and claimed that the appellant had gotten them. Appellant said: "I will see him. I have been wanting to see him a long time. He has been going around here telling lies on me."

Before the parties left the appellant, the deceased appeared. He was driving his automobile and did not stop. The appellant said: "There he goes now. Let's get in the car and overtake him." Appellant said he was going to kill the deceased if he could. The appellant, his father and brother, and the witness then got in the car and drove to the home of Robertson. The appellant went into the yard of the witness Robertson and said something to the deceased. The appellant and deceased then came into the road. Appellant asked about the lies that deceased had been telling about appellant getting his turkeys, and said: "I didn't get your turkeys," at the same time striking the deceased with a pair of brass knucks. Appellant also had some instrument in his hand, which was apparently a sharp instrument. After striking the deceased with the brass knucks, the appellant ran around the car and got a pump, which he threw at the deceased, whereupon deceased picked up the pump and ran around the car. The witness testified that he had a knife with him, but that he did not cut any one. After the difficulty, deceased said to the witness that he had cut Hall, the appellant. Immediately before the difficulty, the appellant said to the witness that if he did not help him he would kill him if it took ten years to do so.

Appellant testified that his father and brother and Parkis came to him; that his father said: "Well, he (deceased) came up to my house in a rage, and I came down to tell you about it, to see what the trouble was, to see if I could quiet it down." He said further: "Well, he was up there and made the threat he was going to get you." The appellant said that something was wrong; that he did not know what it was; that he regarded Holder as his friend. A short time after this conversation Holder arrived and asked the appellant to come to the road. He said he wanted to see him and settle up some business about some turkeys. From the appellant's testimony we quote: "I told Mr. Holder I was ready to see him about that turkey trouble. He started out in the road, and when I went out to reason with him, I asked him what the trouble was we were having over our turkeys. He says, 'You have swiped my turkeys,' and he says, 'We are going to have a settlement.' I says, 'I have never bothered your turkeys, but what kind of a settlement would

you like?' I says, 'If you even think I got any of your turkeys, I have a coop up at the house, and I will give you any amount that you think I got of yours, and we will settle this thing without any trouble.' He says, 'No, he wasn't taking it that way'; he says, 'I am going to take it out in hide.' He was cursing me all the time he was saying this. He also said I was a God damn turkey thief. I told him all right, if he had to take it out in hide, I guess I couldn't help it; and when I told him that, he kicked me on the shin, and when he kicked me, I hit him, of course, like any he-man would do, and then we went into a clinch, but I broke from him, and he broke and run to his car and got a pump. I seen I didn't have a chance to get him, and I ducked my head like this (indicating) and he swung and hit me across the head like this, and before I could get out of his way he hit me again. I was running from him. I broke loose and made two or three trips around his car. When I got an opportunity, I got out of his way. That was the last I knew of the trouble. I didn't know that he had even been cut. Mr. Holder hit me twice with that pump and I hit him somewhere in the face, I don't know where, which was before he got the pump. * * * I did not have a knife with me; I didn't possess a knife; I didn't own a knife. * * * I left there with my father and Grover and Walter Parkis."

On cross-examination the appellant said that his father came and told him that Holder had made threats against him, but said nothing about the turkeys. Appellant said: "I know I did not cut Mr. Holder. I didn't tell any one that I cut Holder." Appellant said further that he did not have the knife which was presented at the trial, and never saw it; that he did not have the knucks produced at the trial."

Accepting the appellant's testimony as true, he was the subject of an unprovoked attack by the deceased. If the state's testimony is believed, the difficulty began by appellant assaulting the deceased. Under such circumstances, it is conceived that the law of provoking the difficulty was not involved and should not have been given in the charge to the jury. The law is tersely stated by Mr. Branch in his Criminal Law, sec. 464, as follows: "If he (the slayer) provoked the combat or produced the occasion *in order to have a pretext* for killing his adversary, or doing him *great bodily harm,* the killing would be murder, no matter to what extremity he may have been reduced in the combat." (Italics ours).

In the same volume it is also said: "If State's case is an unprovoked homicide, and defendant's case is perfect self-defense, the issue of provoking the difficulty is not in the case; beginning a difficulty is not provoking it."

"If the only question involved is 'who made the first attack?' provoking the difficulty is not in the case."

The judgment is reversed and the cause remanded.

*Reversed and remanded.*